# EXHIBIT G

# washingtonpost.com

**CORRECTION TO THIS ARTICLE**
An Oct. 30 article about the disclosure that Valerie Plame was a CIA operative gave an incorrect date for a burglary at Niger's embassy in Rome, when official letterhead stationery was stolen. The burglary occurred in 2001, not 1991. In some editions, the article gave conflicting dates for Vice President Cheney's trip to Norfolk. It was July 12, 2003, not June 12. Also, a reference to the vice president's principal deputy chief of staff should have identified him as Eric Edelman, not John Hannah.

Advertisement


Advertisement

Not all ambition is raw, burning or naked.

THE GEORGE
WASHINGTON
UNIVERSITY
WASHINGTON DC

# A Leak, Then a Deluge

Did a Bush loyalist, trying to protect the case for war in Iraq, obstruct an investigation into who blew the cover of a covert CIA operative?

By Barton Gellman
Washington Post Staff Writer
Sunday, October 30, 2005; A01

Air Force Two arrived in Norfolk on Saturday morning, July 12, 2003, with Vice President Cheney and his chief of staff aboard. They had come "to send forth a great American ship bearing a great American name," as Cheney said from the flag-draped flight deck of the aircraft carrier USS Ronald Reagan.

As Cheney returned to Washington with I. Lewis "Scooter" Libby, the two men spoke of the news on Iraq -- the most ambitious use of the war machine Reagan built two decades before. A troublesome critic was undermining a principal rationale for the war: the depiction of Baghdad, most urgently by Cheney, as a nuclear threat to the United States.

Defending the war became the animating priority aboard Air Force Two that day. According to his indictment on Friday, Libby "discussed with other officials aboard the plane" how he should respond to "pending media inquiries" about the critic, former ambassador Joseph C. Wilson IV. Apart from Libby, only press aide Catherine Martin is known to have accompanied Cheney on that flight.

The crimes alleged in Libby's indictment would come later. But the flight from Norfolk marked a transition in the four-month slide from politics as usual -- close combat in defense of the president's policies -- to what a special prosecutor described as perjury and obstruction of justice. Summer would give way to fall before Libby reached the point of no return, with his first alleged lies to the FBI. But he skirted the line soon after stepping off the aircraft.

That Saturday afternoon, the indictment states, is when Libby confirmed for Matthew Cooper of Time magazine and disclosed to Judith Miller of the New York Times the classified fact that Wilson's wife, who was known as Valerie Plame, "worked at the CIA." Just over two weeks earlier, after a previous conversation with Cheney, Libby had told Miller more tentatively that Plame "might work at a bureau of the CIA."

It may never be clear what drove Libby, the most cautious of Washington insiders, to take such risks, ostensibly to protect the administration. In a news conference Friday, Special Counsel Patrick J. Fitzgerald described the question as unanswerable so far. "If you're asking me what his motives were, I can't tell you; we haven't charged it," Fitzgerald said. The obstruction of his inquiry, he said, "prevents us from making the fine judgments we want to make."

Libby's possible motive is only one of many unknowns left in the aftermath of Friday's indictment, which prompted the resignation of one of the most powerful figures in the White House and left the Bush administration reeling politically. Still to be determined is who first leaked Plame's name to syndicated columnist Robert D. Novak -- the original act that

led to Fitzgerald's investigation -- and the roles of many other administration officials, including Deputy Chief of Staff Karl Rove.

Even so, the grand jury's 22-page indictment fleshes out a saga that has been largely shrouded for almost two years by grand jury secrecy. While Friday's disclosures allege no wrongdoing by Cheney, they place the vice president closer than has been known before to events at the heart of the case.

One notable disclosure is that Libby and Cheney made separate inquiries to the CIA about Wilson's wife, and each confirmed independently that she worked there. It was Cheney, the indictment states, who supplied Libby the detail "that Wilson's wife worked . . . in the Counterproliferation Division" -- an unambiguous declaration that her position was among the case officers of the operations directorate. That conversation took place on June 12, 2003, a month before the Norfolk flight and nearly two weeks before Libby first told a reporter about Plame's CIA affiliation.

Wilson was a former ambassador who traveled to Niger in February 2002 after Cheney requested elaboration on a Defense Department report -- based on erroneous information originating from the Italian security service -- that Iraq had an agreement to buy processed uranium ore, or "yellowcake." Upon his return, Wilson reported to CIA and State Department analysts that he had found no support for the allegation and had reasons to believe it was untrue. When the Bush administration nonetheless launched a public relations campaign that highlighted the uranium report -- most prominently in the president's State of the Union speech on Jan. 28, 2003 -- Wilson began raising questions among friends in government. In March, when the International Atomic Energy Agency exposed the documents as forged, a fact Wilson had not discovered, he began telling journalists in not-for-quotation interviews that the White House propounded a deliberate lie.

Wilson pressed himself fully into the spotlight in the late spring and early summer, a vulnerable moment for the president. The occupation of Iraq had turned unpredictably perilous, with casualties rising in an as-yet-unacknowledged insurgency and strong signs emerging that search teams were at a loss to discover evidence of "weapons of mass destruction."

The uranium claims had never been significant to career analysts -- Iraq had plenty already and lacked the means to enrich it. But the allegations proved irresistible to the White House Iraq Group, which devised the war's communications strategy and included Libby among its members. Every layman understood the connection between uranium and the bomb, participants in the group said in interviews at the time, and it was the easiest way for the Bush administration to raise alarms.

The threat Wilson posed was that his charges were equally simple and marketable. He charged that Cheney asked a question and then disregarded, as did the president and his staff, an answer he did not like.

Why some White House officials -- Rove among them -- used Wilson's wife in their counterattack has yet to be made entirely clear. Wilson himself described the outing as punishment, a threat to his family's safety meant to deter future whistle-blowers. Fragments of testimony unveiled Friday, and in published accounts by journalists who testified, suggest that the White House intended to challenge Wilson's competence by asserting that his wife selected him for the mission to Niger.

Novak, whose July 14 column was the first to expose Plame, wrote three months later that nepotism provided "the missing explanation of an otherwise incredible choice by the CIA."

**Burglary, Forgery, Delivery**

The chain of events that led to Friday's indictment can be traced as far back as 1991, when an unremarkable burglary took place at the embassy of Niger in Rome. All that turned up missing was a quantity of official letterhead with "Republique du Niger" at its top.

More than 10 years later, according to a retired high-ranking U.S. intelligence official, a businessman named Rocco Martino approached the CIA station chief in Rome. An occasional informant for U.S., British, French and Italian intelligence services, Martino brought documents on Niger government letterhead describing secret plans for the sale of uranium to Iraq.

The station chief "saw they were fakes and threw [Martino] out," the former CIA official said. But Italy shared a similar report with the Americans in October 2001, he said, and the CIA gave it circulation because it did not know the Italians relied on the same source.

On Feb. 12, 2002, Cheney received an expanded version of the unconfirmed Italian report. It said Iraq's then-ambassador to the Vatican had led a mission to Niger in 1999 and sealed a deal for the purchase of 500 tons of uranium in July 2000. Cheney asked for more information.

The same day, Plame wrote to her superior in the CIA's Counterproliferation Division that "my husband has good relations with both the PM [prime minister] and the former Minister of Mines (not to mention lots of French contacts), both of whom could possibly shed light on this sort of activity." Wilson -- who had undertaken a similar mission three years before -- soon departed for Niamey, the Niger capital. He said he found no support for the uranium report and said so when he returned.

Martino continued to peddle his documents, with an asking price of more than 10,000 euros -- this time to Panorama, an Italian magazine owned by Prime Minister Silvio Berlusconi. Panorama editor Carlo Rossella said his staff concluded the letters were bogus but in the interim sent copies to the U.S. Embassy in Rome in October 2002. "I believed the Americans were the best source for verifying authenticity," he said. When the documents reached the State Department, according to a commission that investigated prewar intelligence this year, analysts there said they had "serious doubts about the authenticity" of the "transparently forged" documents.

By summer 2002, the White House Iraq Group assigned Communications Director James R. Wilkinson to prepare a white paper for public release, describing the "grave and gathering danger" of Iraq's allegedly "reconstituted" nuclear weapons program. Wilkinson gave prominent place to the claim that Iraq "sought uranium oxide, an essential ingredient in the enrichment process, from Africa." That claim, along with repeated use of the "mushroom cloud" image by top officials beginning in September, became the emotional heart of the case against Iraq.

President Bush invoked the mushroom cloud in an Oct. 7, 2002, speech in Cincinnati. References to African uranium remained in his speech until its fifth draft, but a last-minute intervention by Director of Central Intelligence George J. Tenet excised them.

Tenet's success was short-lived. The uranium returned repeatedly to Bush administration rhetoric in December and January. National security adviser Condoleezza Rice cited the report in a Jan. 23 newspaper column, and three days later, at the World Economic Forum in Davos, Switzerland, Secretary of State Colin L. Powell demanded, "Why is Iraq still trying to procure uranium and the special equipment needed to transform it into material for a nuclear weapon?"

## 16 Words and Wilson Strikes Back

By the time Bush stated the case personally -- in the notorious "16 words" of his Jan. 28 State of the Union address -- the uranium had been thoroughly integrated into his government's case for impending war with Iraq.

The IAEA exposed the documents as forgeries on March 7, 2003. The Bush administration, while acknowledging uncertainty, did not admit its primary evidence had been faked.

Late April and early May saw a succession of Bush administration assertions that the search for Iraq's weapons of mass destruction had just begun. By then, The Washington Post was reporting that teams looking for weapons in Iraq were departing in frustration, making way for a new Iraq Survey Group that became an 18-month forensic examination of

where U.S. intelligence had gone wrong.

Wilson spoke anonymously about his trip to Niger to New York Times opinion writer Nicholas D. Kristof, whose May 6 column accused Cheney of permitting truth to go "missing in action." The failure of the weapons hunt, and alleged deception of the public, had been laid at Cheney's feet.

In the vice president's office, Libby had long since come to believe that the CIA was undermining Cheney and the president's conduct of the war. One undercurrent of the events to come was a venerable form of Washington institutional combat, between the White House and the executive agencies ostensibly under its command.

Miller of the New York Times wrote later that Libby believed the CIA was hedging against accusations of failure by blaming Cheney and Bush for its mistakes. Another top official, a longtime ally of Libby's, told a reporter at the time that the CIA was working actively to conceal evidence favorable to the White House.

Libby had known enemies inside government -- but an unknown enemy outside. It did not take him long to discover that the latter was Wilson.

**'There Would Be Complications'**

In late May and early June 2003, according to Fitzgerald's indictment, Libby asked for and received information about Wilson's trip from a senior State Department official, who is not named in the indictment but is identified by colleagues as then-Undersecretary of State Marc Grossman.

On June 9, the CIA faxed classified accounts of Wilson's assignment "to the personal attention of Libby and another person in the Office of the Vice President." Two or three days later, Grossman told Libby that Wilson's wife worked at the CIA and had been involved in planning Wilson's trip. An unidentified "senior officer of the CIA" confirmed Plame's employment for Libby on June 11, and Cheney told Libby the next day which part of the agency employed her.

For Libby, according to a senior official who worked with him at the time, "I think this just hit a nerve." By June, he said, "the blind, deaf and dumb had to be aware that something was wrong in Iraq." Uranium was "always a side issue," but it was also "the beginning of the unraveling of the big story . . . calling attention to a huge mistake he was part of. So it's no wonder he took this personally."

A senior intelligence officer who knew of Libby's inquiries about Wilson and Plame said in an interview yesterday, "It didn't occur to anyone that the reason why was so that her name would go out to reporters." That, the official said, is "the lesson you learn from this."

On June 12, The Post published a story challenging the uranium claims. Wilson has since said he was among the sources for that story.

A man identified by colleagues as John Hannah, described in the indictment as Libby's "then principal deputy," asked Libby soon afterward whether "information about Wilson's trip could be shared with the press." Libby replied, the indictment states, "that there would be complications at the CIA in disclosing that information publicly."

On June 23, Libby allegedly crossed his first big line. At a meeting in his office with Miller of the Times, he said Wilson's wife might be a CIA employee.

**Attack and Counterattack**

Wilson emerged from anonymity with a splash on July 6, telling his story in a New York Times opinion column, a lengthy on-the-record interview with The Post and an appearance on NBC's "Meet the Press."

The next day, Libby lunched with Ari Fleischer, the White House press secretary, according to the indictment. He told Fleischer that Wilson's wife worked for the CIA and noted that the information was not widely known. The same day, the State Department sent Powell a classified memorandum written a month earlier identifying Wilson's wife as a CIA employee and saying it was believed she recommended Wilson for the Niger mission. Powell was traveling with Bush to Africa, and sources said the memorandum was widely circulated among officials with appropriate clearances aboard Air Force One.

On July 8, Libby met Miller, the reporter, for breakfast at the St. Regis Hotel at 16th and K streets. Asking that she attribute the information to a "former Hill staffer" -- he had once been legal adviser to a House select committee -- Libby criticized CIA reporting of Wilson's trip and "advised reporter Judith Miller of his belief that Wilson's wife worked at the CIA," the indictment states.

On July 12, the day Cheney and Libby flew together from Norfolk, Libby talked to Miller and Cooper. That same day, another administration official who has not been identified publicly returned a call from Walter Pincus of The Post. He "veered off the precise matter we were discussing" and said Wilson's trip was a boondoggle set up by Wilson's wife, Pincus has written in Nieman Reports.

Earlier that week Rove and another unknown source gave the information to Novak as well.

On July 14, for the first time, the name passed into the public domain in sixth paragraph of Novak's syndicated column: "his wife, Valerie Plame, is an agency operative." For all its seismic importance now, that column provoked little immediate response.

Time magazine reported on its Web site shortly afterward -- based on sources that Cooper, the author, has since identified as Rove and Libby -- that "some government officials have noted to Time in interviews . . . that Wilson's wife, Valerie Plame, is a CIA official who monitors the proliferation of weapons of mass destruction."

David Corn of the Nation was among the first to protest. Naming Wilson's wife, he wrote July 16, "would have compromised every operation, every relationship, every network with which she had been associated her entire career."

By the following week the story reached NBC's "Today Show," and Sen. Charles E. Schumer (D-N.Y.) demanded an investigation. The administration replied without apology at first. According to Wilson, MSNBC's Chris Matthews told him off camera: "I just got off the phone with Karl Rove, who said your wife was 'fair game.' "

Out of view of the public, the CIA took the first steps towards a formal investigation. On July 30, it reported to the Justice Department a possible offense "concerning the unauthorized disclosure of classified information." In August the agency completed an 11-question form detailing the potential damage done. In September, Tenet followed up with a memo raising questions about whether the leakers had violated federal law.

On Sept. 26, 2003, the FBI launched an inquiry into who leaked Plame's name and occupation.

**'If Only It Were True'**

Justice Department lawyers notified then-White House Counsel Alberto R. Gonzales at about 8 p.m. Monday, Sept. 29, that the investigation had begun. Gonzales, now attorney general, has said he alerted Chief of Staff Andrew H. Card Jr. at once. But he did not tell anyone else -- or instruct White House employees to preserve all evidence -- until the following morning. According to Gonzales, lawyers at Justice said it would be fine to wait.

John Dion, a veteran counter-espionage prosecutor, ran the initial investigation with a team of FBI agents at his disposal. They soon brought in Rove and other top aides for questioning.

But early signals from the White House suggested the probe might come to nothing. Bush expressed doubts on Oct. 7. "I don't know if we're going to find out the senior administration official," he said. "Now, this is a large administration, and there's a lot of senior officials."

Three days later, White House spokesman Scott McClellan told reporters he had talked to three officials -- Libby, Rove and Elliot Abrams -- and "those individuals assured me they were not involved in this."

The following Tuesday, Oct. 14, Libby reached a decision point. The FBI asked whether he had disclosed Plame's job or identity to any reporter, and he said he had not even known those details until July 10 or 11. His source, he asserted, was NBC's Tim Russert. According to the indictment, he said he passed along Russert's information as gossip to Cooper of Time. He told the FBI that he did not discuss Plame with Miller at all when they met on July 8.

Current and former officials said they did not know why Libby made those statements. Perhaps, they said, Libby believed the reporters would never be forced to testify, or that the statements from Bush and McClellan encouraged him to believe the inquiry would reach no result. Whatever his reasons, Libby had committed himself. He would give much the same account to agents again in November, and repeated them twice in sworn testimony before a grand jury.

"It would be a compelling story that will lead the FBI to go away, if only it were true," Fitzgerald said in his Friday news conference. "It is not true, according to the indictment."

Libby's attorney, Joseph Tate, has said Libby testified to the best of his recollection. "We are quite distressed the special counsel has now sought to pursue alleged inconsistencies in Mr. Libby's recollection and those of others and to charge such inconsistencies as false statements," Tate said in a statement Friday.

### 'Eliot Ness With a Harvard Law Degree'

On the next to last day of 2003, John D. Ashcroft, then attorney general, abruptly recused himself from the case. He had ignored months of complaints from Democrats that his political ties to potential suspects should disqualify him from supervising the investigation. Rove, in particular, was a longtime friend and paid adviser to Ashcroft's campaigns for Missouri governor and the U.S. Senate.

Through the fall and winter, officials said, Ashcroft received periodic briefings on the case. In the last week of December, about a month after Libby's second interview with the FBI, then-Deputy Attorney General James B. Comey had multiple discussions with Ashcroft about whether it was time for a change, Comey has said.

Comey told reporters on Dec. 30 that an "accumulation of facts" in the investigation had brought about Ashcroft's recusal. Details of their conversations have not been made public, and it is not known who initiated them.

"The issue surrounding the attorney general's recusal is not one of actual conflict of interest," Comey said, but "one of appearance."

Juleanna Glover Weiss, a spokesman for Ashcroft's Washington consulting firm, said yesterday that the former attorney general would not discuss the decision.

Republican officials expressed the hope at that time that Ashcroft's recusal would provide political cover for the White House if no indictment resulted. One said the move would "depoliticize" the case on the eve of presidential campaign season.

Ashcroft's departure brought to the probe a man Comey described as "Eliot Ness with a Harvard law degree." Fitzgerald, an old colleague of Comey who had recently become U.S. attorney in Chicago, asked for and received the full delegated powers of the attorney general. A month later, Comey clarified in writing that Fitzgerald could pursue any

violation of criminal law associated with the case -- including perjury and obstruction of justice, the heart of the indictment handed up Friday against the vice president's chief of staff.

## Indictment and Resignation

After a year-long struggle with journalists, who resisted demands to disclose their sources, Fitzgerald persuaded Chief U.S. District Judge Thomas F. Hogan -- and the appellate judges above him -- that reporters were the only available "eyewitness[es] to the crime." Pincus, Cooper and Russert gave testimony under negotiated limits after receiving the consent of their sources. Miller went to jail for 85 days, then testified after Libby gave her his direct consent, by letter and telephone. Novak has never disclosed whether he spoke to Fitzgerald's grand jury.

The denouement came Friday. Just after noon, six men and 13 women filed silently into Courtroom Four in the E. Barrett Prettyman federal courthouse. They had served on Fitzgerald's grand jury for two years. Now they sat silently before U.S. Magistrate Judge Deborah A. Robinson. Calling the courtroom to order, Robinson asked whether the grand jury had something to present. The forewoman, wearing a black cardigan, rose and walked a few steps with a sheaf of papers. She handed them up to the magistrate's clerk. Robinson declared them in order and adjourned.

Charged with five felony counts, Libby resigned from the vice president's office that day.

Fitzgerald, in his news conference, said he could not speculate on whether anyone else would be charged. He said "the substantial bulk of the work of this investigation has concluded," but not all of it.

"I will not end the investigation," he said, "until I can look anyone in the eye and tell them that we have carried out our responsibility."

*Staff writers Dan Eggen, Dafna Linzer, Dana Milbank and Christopher Lee, and researcher Julie Tate contributed to this report.*

© 2005 The Washington Post Company

Ads by Google

**Current Events**
Get Breaking News, Top Stories, & Headlines on Your Desktop Free!
www.Starware.com/News

**George Bush Bill Clinton**
Who Is A Better President? Vote Now To See Who's Winning!
www.popularq.com

**Rove: Victim or Villain?**
Is he responsible for the leak? Are the media against him? Vote now!
www.PollingPoint.com

# EXHIBIT H

**Bloomberg.com**

▸ ⎙ **Print**

# Special Prosecutor's Probe Centers on Rove, Memo, Phone Calls

July 18 (Bloomberg) -- The fate of White House Deputy Chief of Staff Karl Rove may rest with the old Watergate question: What did he know and when did he know it?

Special Prosecutor Patrick Fitzgerald's investigation of the leaking of a Central Intelligence Agency agent's name is now focused on how Rove, one of President George W. Bush's closest advisers, and other administration officials dealt with a key fact in an equally key memo.

The memo, prepared by the State Department on July 7, 2003, informed top administration officials that the wife of ex-diplomat and Bush critic Joseph Wilson was a CIA agent. Seven days later, Wilson's wife, Valerie Plame, was publicly identified as a CIA operative by syndicated columnist Robert Novak.

On the same day the memo was prepared, White House phone logs show Novak placed a call to White House Press Secretary Ari Fleischer, according to lawyers familiar with the case and a witness who has testified before the grand jury. Those people say it is not clear whether Fleischer returned the call, and Fleischer has refused to comment.

The Novak call may loom large in the investigation because Fleischer was among a group of administration officials who left Washington later that day on a presidential trip to Africa. On the flight to Africa, Fleischer was seen perusing the State Department memo on Wilson and his wife, according to a former administration official who was also on the trip.

In addition, on July 8, 2003, the day after the memo was sent, Novak discussed Wilson and his wife with Rove, who had remained in Washington, according to the New York Times.

The Times quoted an attorney familiar with Fitzgerald's probe as saying that when Novak mentioned Wilson's wife worked for the CIA, Rove said, ``Yeah, I've heard that too.''

Mission to Niger

Three days after that, on July 11, Rove also discussed Wilson and his wife with Time Magazine reporter Matthew Cooper, Cooper said yesterday. Rove told the reporter that Wilson's wife worked for the CIA and had a hand in having Wilson sent to Niger in 2002 to check out reports that Saddam Hussein was trying to buy uranium for a nuclear weapons program, Cooper said during an appearance on NBC's ``Meet the Press'' program.

Cooper, who recently testified before the grand jury after a long legal battle to keep his sources secret, said Vice President Dick Cheney's chief of staff, Lewis ``Scooter'' Libby, told him the same thing. Cooper said neither Rove nor Libby mentioned Wilson's wife by name.

Bush, in Sept. 30, 2003, comments to reporters, said that ``if somebody did leak classified information, I'd like to know it, and we'll take the appropriate action.'' His remarks echoed those of his spokesman, Scott McClellan, who had said the day before, ``If anyone in this administration was involved in it, they would no longer be in this administration.''

On June 10, 2004, Bush answered ``Yes'' when asked whether he whether he would fire anyone who leaked Plame's name.

Not by Name

Rove's attorney, Robert Luskin, has said that Rove mentioned to Cooper that Wilson's wife was a CIA agent but did not identify her by name.

In Time's July 18 edition, Cooper writes that Rove ended their brief telephone conversation by saying, ``I've already said too much.'' Cooper added that he was unsure whether that indicated Rove knew he had revealed information he should not have mentioned, or whether Rove was simply indicating he was pressed for time and had to end the call.

As a result of these facts, the State Department memo has become a central element in Fitzgerald's investigation of how Plame came to be publicly identified as a CIA agent and whether that violated a 1982 law making it a federal crime to divulge the identity of a covert intelligence operative.

The memo was prepared by the department's Bureau of Intelligence and Research at the request of then-Secretary of State Colin Powell, according to current and former government officials familiar with Powell's request.

Wilson's Article

Powell asked for it on July 6, 2003, the same day Wilson published an opinion article in the New York Times revealing his trip to Niger and his conclusion that there was no evidence to support the claim that Hussein was seeking uranium there. Wilson went on to accuse the Bush administration of ignoring his findings and similar intelligence to make a case for war in Iraq.

The current and former government officials say that the report reached Powell sometime on July 7. It said Wilson had been approved for the Niger trip by mid-level CIA officials on the recommendation of his wife, a counter-proliferation expert at the spy agency.

A key question will be which officials received the report and when. The special prosecutor has subpoenaed telephone and fax records from Air Force One and the White House.

Inner Circle

Fleischer, who saw the July 7 memo, wasn't part of Bush's inner circle during his tenure as press secretary, while Rove was at the heart of it. Given those facts, it seems highly doubtful that Fleischer would have acted on the information in the memo without the knowledge or approval of Rove and other top-level White House officials.

The July 7 memo was largely a reproduction of an earlier State Department report prepared around June 12. Another key question that Fitzgerald is interested in, according to the grand jury witness and the lawyers familiar with the case, is whether Rove or Libby learned of this earlier report and, if so, shared its content with reporters.

Rove's defenders say the recent revelations in the case -- some of which have emanated from his camp -- serve to exonerate rather than implicate him.

They say those revelations show that Rove was not the original source of Plame's identity for either Novak or Cooper. They note that the 1982 law sets a high bar for prosecution: Fitzgerald would have to prove that the person outing Plame did so knowingly and in awareness that the government was trying to conceal her identity.

Five-Year Window

In addition, the law only makes it illegal to divulge the identity of an agent who worked overseas within the past five years; Plame has lived in the U.S. since 1997.

Republican Party Chairman Ken Mehlman said yesterday on ``Meet the Press'' that recent newspaper stories ``have the effect of exonerating and vindicating Mr. Rove, not implicating him. That information says Karl Rove was not Bob Novak's source, that Novak told Rove, not the other way around, and it says that Karl warned Matt Cooper about Joe Wilson.''

Others see difficulties in these arguments. They note the inherent contradiction between Rove's testimony to the grand jury that he learned Plame's name from Novak and his statement to Novak during the July 8 phone call that ``I've heard that, too.''

Potential Problem

This points toward a potential problem for Rove in the direction of Fitzgerald's investigation. It now

has expanded beyond its original mission -- to determine if the 1982 law was violated -- to encompass whether any White House officials, including Rove and Fleischer, have testified falsely about the case or obstructed justice by trying to cover up their involvement in the leak, according to people familiar with the case who cite a pattern of questioning by Fitzgerald.

In addition, there is strong reason to believe that Fitzgerald is hunting big game, according to several legal experts. They say that is demonstrated by the fact that he has done something that no federal prosecutor has done in 30 years: send a reporter, Judith Miller of the New York Times, to jail for refusing to divulge with whom she spoke about the Wilson-Plame case.

``You wouldn't expect him to go to these lengths unless he thought he had something serious to look at,'' said Randall Eliason, the former chief of the public corruption section at the U.S. Attorney's office in Washington. ``You don't compel reporters to testify or jail reporters unless you have a pretty good reason.''

Tatel's Opinion

That ``pretty good reason'' was highlighted by U.S. Appellate Judge David Tatel in his Feb. 15 opinion concurring that Miller and Cooper must testify in the Plame case.

Tatel noted that the vast majority of the states, as well as the Justice Department, ``would require us to protect reporters' sources as a matter of federal common law were the leak at issue either less harmful or more newsworthy.''

However, he added, ``just as attorney-client communications made for the purpose of getting advice for the commission of a fraud or crime serve no public interest and receive no privilege, neither should courts protect sources whose leaks harm national security while providing minimal benefit to public debate.''

-- With reporting by Laurie Asseo in Washington. Editor: Fireman, Kraus

```
To contact the reporters on this story: Richard Keil in
Washington at (1)    dkeil@bloomberg.net
William Roberts in Washington at  wroberts@bloomberg.net.
```

*Last Updated: July 18, 2005 00:01 EDT*

▶ ⎙ **Print**

# EXHIBIT I

**MSNBC.com**

**Newsweek**

# Rove at War

**He rose using tactics his foes are turning against him. But never bet against Karl Rove.**

**By Howard Fineman**
Newsweek
Updated: 4:04 p.m. ET July 17, 2005

July 25 issue - Karl Rove is a hunter. His favorite quarry in Texas is quail; in Washington, it's foes of George W. Bush or Vice President Dick Cheney. Rove was focused intently, with a touch of anger, on his prey. It was Monday, July 7, 2003, the day after Joe Wilson, a veteran diplomat, had launched a damaging public assault on a central administration rationale for the war in Iraq: that Saddam Hussein had been trying to buy yellowcake uranium in Niger. In a New York Times op-ed piece and a companion appearance on "Meet the Press," Wilson said he had been dispatched to the African country in 2002 by the CIA, at the behest of Cheney, to check out the yellowcake claim—and had found it flimsy at best.

Now here, in the gun sight of Rove, was a bird in flight. Until then, Wilson had been obscured from view, peddling his story and his doubts—but not his own name—to selected reporters, officials and Hill staffers. The resulting stories had attracted the administration's attention. In May, the State Department's intelligence unit had prepared a secret memorandum about the provenance of Wilson's journey and its classified results—including the curious fact that Wilson's wife, a CIA agent then working on weapons of mass destruction issues, had been involved in planning the mission, and had even suggested that her husband undertake it. Still, there had been no cause to criticize Wilson—let alone mention his wife.

But then Wilson went public. Some prominent administration officials scurried for cover. Traveling in Africa, Secretary of State Colin Powell, who had long harbored doubts, disowned the "sixteen words" about Niger that had ended up in Bush's prewar State of the Union speech. So did CIA Director George Tenet, who said they shouldn't have been in the text. But Cheney—who tended never to give an inch on any topic—held firm. And so, therefore, did Rove, who sometimes referred to the vice president as "Leadership." Rove took foreign-policy cues from the pro-war coterie that surrounded the vice president, and was personally and operationally close to Cheney's chief of staff, Lewis (Scooter) Libby.

Soon enough, Rove had drawn a bead on Wilson. The diplomat was a Democrat who had worked on national-security issues in the Clinton administration; he had donated money to Al Gore in 2000. Now, Rove had heard, he was friendly with Sen. John Kerry. Wilson was trying to drag Cheney into the story for partisan reasons—to caricature him as the dark, secret taskmaster of the war. Cheney hadn't dispatched Wilson; the vice president hadn't had anything directly to do with it.

In the World According to Karl Rove, you take the offensive, and stay there. You create a narrative that glosses over complex, mitigating facts to divide the world into friends and enemies, light and darkness, good and bad, Bush versus Saddam. You are loyal to a fault to your friends, merciless to your enemies. You keep your candidate's public rhetoric sunny and uplifting, finding others to do the attacking. You study the details, and learn more about your foes than they know about themselves. You use the jujitsu of media flow to flip the energy of your enemies against them. The Boss never discusses political mechanics in public. But in fact everything is political—and everyone is fair game.



Which now includes Rove. In a familiar Washington twist of fate, Rove's theory of politics is being turned against him—and he is being forced to deploy the Republican machine, which he built on Bush's behalf, for a more personal task: his own defense. A federal prosecutor is now coming to the climax of an investigation into whether any administration official committed a crime by disclosing the identity of a CIA agent—Wilson's wife, Valerie Plame—to reporters. The prosecutor may also be looking at whether anyone lied to the grand jury about the matter—the classic Washington crime of a cover-up. Democrats are in full cry, demanding that Rove be hauled before congressional-committee hearings, stripped of his security clearance, fired outright—or all three.

Beyond the legal drama, the story of the White House's response to the Wilson trip is offering the country that rarest of opportunities in the Age of Bush II: a glimpse of the inner workings of a White House under the management of Karl Rove, the most influential presidential adviser in memory. And while liberals who have long viewed Rove with fear and loathing are gleeful at his current political plight, Rove's own legions are rallying—which means, interestingly, that the harsh culture now pummeling him may in fact save him as Bush's Red soldiers take the field.

Rove's lawyer says that there has been no wrongdoing, and that the prosecutor has told him that Rove is not a "target" of the probe. But this isn't just about the Facts, it's about what Rove's foes regard as a higher Truth: that he is a one-man epicenter of a narrative of Evil. The Manichaean politics that Rove had perfected over three decades now threaten to engulf him, or at least render him as something less than what he has been to Bush: the mastermind of Republican hegemony. "He's in a tough spot, but he is the survivor's survivor," says Frank Luntz, a political consultant for many GOP candidates. Maybe, but Rove is not in control of his own story. For now the author in charge is Patrick Fitzgerald, the prosecutor, who seems oblivious to politics altogether.

It's unlikely that any White House officials considered that they were doing anything illegal in going after Joe Wilson. Indeed, the line between national security and politics had long since been all but erased by the Bush administration. In the months after 9/11, the Republican National Committee, a part of Rove's empire, had sent out a fund-raising letter that showed the president aboard Air Force One in the hours after the attack. Democrats howled, but that was the Bush Rove was selling in the re-election campaign: commander in chief. Now Wilson was getting in the way of that glorious story, essentially accusing the administration of having blundered or lied the country into war.

How do you publicly counter a guy like that? As "senior adviser," Rove would be involved in finding out. Technically, Rove was in charge of politics, not "communications." But, as he saw it, the two were one and the same—and he used his heavyweight status to push the message machine run by his Texas protegé and friend, Dan Bartlett. Press Secretary Ari Fleischer was sent out to trash the Wilson op-ed. "Zero, *nada,* nothing new here," he said. Then, on a long Bush trip to Africa, Fleischer and Bartlett prompted clusters of reporters to look into the bureaucratic origins of the Wilson trip. How did the spin doctors know to cast that lure? One possible explanation: some aides may have read the State Department intel memo, which Powell had brought with him aboard Air Force One.



Meanwhile, in transatlantic secure phone calls, the message machinery focused on a crucial topic: who should carry the freight on the following Sunday's talk shows? The message: protect Cheney by explaining that he had had nothing to do with sending Wilson to Niger, and dismiss the yellowcake issue. Powell was ruled out. He wasn't a team player, as he had proved by his dismissive comments about the "sixteen words." Donald Rumsfeld was pressed into duty, as was Condi Rice, the ultimate good soldier. She was on the Africa trip with the president, though, and wouldn't be getting back until Saturday night. To allow her to prepare on the long flight home to D.C., White House officials assembled a briefing book, which they faxed to the Bush entourage in Africa. The book was primarily prepared by her National Security Council staff. It contained classified information—perhaps including all or part of the memo from State. The entire binder was labeled TOP SECRET.

Back in Washington, busying himself mainly with the task of sketching the outlines of Bush's 2004 re-election campaign, Rove—patient bird hunter that he is—waited in the duck blind of his West Wing office. His first chance to take a shot arrived on Wednesday, July 9, when he spoke to a journalist with whom he had done business since the 1970s—Bob Novak. In 1992, in fact, Rove had been banished from Bush I's re-election campaign after he was fingered (wrongly, both men insisted) as a source for a Novak column about Republican unrest in Texas. What did Rove make of the story, which Novak had gotten from what he later called a person who was "no partisan gunslinger," that Wilson had been sent to Niger at the behest of his wife, Valerie Plame?

Rove's reply is in dispute. According to a later column written by Novak, Rove said, "Oh, you know about it." Rove's version, made public by a source close to him, is less solid: "I heard that, too." Whatever the exact words were, they were good enough to give Novak the confirmation he thought he needed. Citing two senior administration officials, he wrote a piece—with Wilson's wife's name—for release nationwide the next Monday.

Rove's next and last shot came in a brief, end-of-the-week call from Matt Cooper of Time magazine. As NEWSWEEK has reported, Cooper later wrote an e-mail to his bureau chief, saying that Rove had tried to wave him off the Wilson story—and mentioned Wilson's wife in the process: "it was, KR said, wilson's wife, who apparently works at the agency on WMD issues who authorized the trip," Cooper's e-mail read. Cooper would write about the matter online the following week, after the Novak article appeared. (Rove did not initially discuss the conversation with Cooper in his first interview with the FBI, a source close to Rove, who declined to be identified because of the ongoing investigation, told NEWSWEEK. But Rove later testified about it, the source said.) That weekend, the talk-show soldiers did their duty. Rumsfeld drew the fire on other issues; Condi did her best to distance the vice president from the Wilson trip.

Missions accomplished. Except for a few little details. Under a 1982 law, it's a felony to intentionally disclose the name of a "covered" agent with the intent to harm national security. Under another, older statute, it could also be a felony to willfully disclose information from a classified document—which the State Department memo and, apparently, the Condi briefing book were. There is no indication that Rove saw the briefing book (Rumsfeld didn't get one) or that anyone disclosed classified information. But no one in the administration seems to have noticed the irony—or the legal danger—in assembling a TOP SECRET briefing book as guidance for the Sunday talk shows. Exactly what papers with what classifications were floating around on Air Force One? Who, if anyone, was dipping into them for info about the Wilson trip?

And if Rove knew Plame's identity, as Novak says, how did Rove learn it? A source close to Rove has said Rove never saw the State memo. The same source told NEWSWEEK last week that Rove "doesn't remember" where he

heard the crucial information about Wilson's wife. But, the source said, Rove is "pretty sure he heard it directly or indirectly from a media source." The source close to Rove later acknowledged that Rove had been questioned by investigators about conversations he may have had with Libby, Cheney's chief of staff. Rove couldn't recall any specific exchange with Libby about Wilson's wife, the source said. A spokeswoman for the vice president's office said Libby would have no comment. Fitzgerald declined to comment.



If the polarities were reversed—if this were a Democratic White House—these are the kinds of breach-of-security questions for which Rove would be demanding swift answers. Which party was for protecting the shadow warriors in the war on terror? Rove —would want to know.

So would Richard Nixon, Rove's first political hero. For boys of a certain place and time—including the Salt Lake City of the 1950s and '60s—Nixon was a haunted hero, a permanently embattled, commie-fighting Republican who had no use for weak-kneed swells and who stood for decency and Main Street values. As a boy, Rove—like many another conservative kid of the baby boom—was initially drawn toward politics by Nixon, and by the apocalyptic, anti-communist message of the FBI's J. Edgar Hoover. WAKE UP, AMERICA! proclaimed a sign above Rove's boyhood bed.

Rove's father was an oil geologist, and it was perhaps from him that Rove got both his sense of history and his almost manic love of detail. You measured time in eons, but you found evidence with a magnifying glass. One of five kids, a voracious reader with a vaulting sense of ambition, Rove wanted to be president—or at least be able to debate like one. Nixon and Jack Kennedy had squared off dramatically in 1960. Karl was only 9 but eventually became a mainstay of the debate team, carrying a box full of notecards of "research." To intimidate his foes, Rove would arrive with what looked like thousands of notecards, most of which were blank. The real ones were carefully chosen, and Rove knew how to use them.

Like an entire generation of baby-boom conservatives, Rove's political boot camp was the College Republicans, which, in his case, was something of a misnomer, since he dropped out of the University of Utah to join them in the late '60s. They were under the aegis of the Nixon White House, a tie that may have augmented the usual adolescent urge to dabble in dirty tricks. Rove did his share—stealing campaign stationery and inviting the world to a Democratic beer bash was one—but the CRs were important to him for other reasons. They gave him a sense of order and belonging, which he may well have needed. His dad walked out in 1969; in 1970, he learned that he and a brother had been fathered by someone other than the man he had called Dad. (Eleven years later, his mother committed suicide.)

The CRs led Rove to understand the power of ideas in politics—and to his fateful first meeting with the man who would become his partner in public life, George W. Bush. Ostensibly pragmatic Nixonites, the CRs' real heroes were Barry Goldwater and Ronald Reagan, as Rove realized when his bid to lead the group ran into a wall of conservative opposition. He ultimately prevailed, thanks to an administrative ruling by George H.W. Bush, who chaired the adult Republican National Committee. The two became friends. On Thanksgiving in 1973, Bush, through an aide, asked Rove to take the family car keys to Union Station and give them to his son, who was arriving from his first semester at Harvard Business School. Rove recalls the scene in a kind of gauzy cinematic slow-mo: "He was wearing jeans, and a bomber jacket, and he had an aura of confidence and charisma," Rove once told NEWSWEEK. Rove's dreams of becoming president ended there—but that is also probably where George

W. Bush's career began.

In retrospect, the road from there to here is as straight as a West Texas highway. Rove and Bush were on the move in Texas in the mid-'70s, Bush to the oil business, Rove to consulting. In the early years, Rove made more money than Bush by getting involved in the then new business of direct mail. Combining his geeky loves—technology, granular political detail and hard-hitting rhetoric—he learned to fashion carefully targeted, incendiary fund-raising letters that could (and did) raise millions. Direct mail remains the key to understanding Rove's approach to politics: minutely targeted, upbeat when possible, apocalyptic as needed. (The mailbag Manichaeanism can get ugly, as it did in New York recently, where Rove crudely accused post-9/11 liberals of merely wanting to "prepare indictments and offer therapy and understanding for our attackers.")



It didn't take Rove long in Texas to conclude that the state's tectonic plates were shifting in a Republican direction. The key was to combine the pro-business money of corporate Houston and Dallas with the conservative values—and the Bible-belt traditionalism—of rural (and, up to that point, Democratic) small-town Texas. How? By the early 1990s, Rove had his plan and his man: George W. Bush, whose incandescent personality and "compassionate conservatism" covered both flanks. Rove made it Bush's business to get right with the religious right, but not so much on theology as good works. The idea was to replace government-run welfare and education with church-based charity, saving money and souls at the same time, and not to run as a foe of government per se but as a "reformer" of it.

On the way to Austin and then to Washington, Bush and Rove developed a relationship unlike any other in modern politics. They were brothers, but not quite; master and servant, but not quite; king and court jester, but not quite—and tied together by what looks like an unshakable bond of mutual loyalty. Outsiders thought it might be tested after Bush was clobbered in the 2000 New Hampshire primary by John McCain. Rove had badly underestimated the senator there. In similar situations, handlers have offered to resign. Asked by NEWSWEEK if he would do so, Rove exploded in a mix of derision, pity and anger. "I can't believe you're asking that!" he shouted. "Of course not!"

Later that week, on a campaign bus rolling through South Carolina, Bush and Rove—now a comedy act—pretended to replay their own responses on election night, rolling their eyes and collapsing "drunk" in their bus seats. "We've lost by *twenty* damn *points*!" Rove said, as if talking to Bush on the phone. "Dammit, Karl, you've ruined everything!" Bush yelled back. The good ole boys onboard didn't know what to make of the scene. But allies elsewhere in upstate South Carolina knew what to do. They employed every nasty accusation and rumor in the book to discredit and defeat McCain.

And Bush and Rove are still together. As news spread of Rove's chats with Novak and Cooper, Democrats turned up the heat. But while the president did not defend his buddy in so many words—saying that he would wait for the Fitzgerald probe to end—Bush kept Rove by his side in photo ops in and around the White House. On a Bush trip to North Carolina, Rove clowned in his manic way with reporters—behavior of the kind he tends to display when he feels under pressure.

At the same time, the GOP machine he had built began clanking into gear. Rove has friends all over town, and the country—people he's put in office and, with ruthless efficiency, into key government and lobbying jobs. But they were slow to react, perhaps in part because the apparatus is built to attack more than defend. Last Monday, Scott McClellan, the White House press secretary, was seared to a crisp during his press briefing. Only the following day did GOP Chairman Ken Mehlman—whose entire career is a Rove creation—respond. Some of the party talking points had a vaguely Clintonesque feel to them: that Rove was merely trying to help the reporters, that he never actually mentioned Valerie Plame's name, that he didn't call the reporters, they had called him. The Democrats,

eager to seize the rare piece of high ground on a national-security issue, kept up the fire. But since they have no subpoena power on the Hill—Rove's GOP is in charge there—they can't call him to testify. And the louder the Democrats screamed, the easier it was for Rove and his allies to dismiss the whole affair as just another Red-Blue partisan smackdown.

As for Rove, friends say that he was shaken by the speed with which the Wilson story moved—and in a direction he didn't expect. He's used to being in control. But now all Rove can do is mark time until someone else—Patrick Fitzgerald—says what comes next. After his re-election victory last November, Bush called Rove the "Architect." Now the hunter has to wait with everyone else to see if he has become the hunted.

*With Michael Isikoff, Richard Wolffe and Holly Bailey*

© 2006 MSNBC.com

URL: http://www.msnbc.msn.com/id/8600327/site/newsweek/

# EXHIBIT J

**politics**

# Where's *My* Subpoena?

*Valerie Plame, Scooter Libby, and me.*
By John Dickerson
Posted Tuesday, Feb. 7, 2006, at 6:36 AM ET

In Washington, the only thing worse than having to testify before a grand jury is not being asked to. I never wanted to go to prison or make hard choices about protecting my sources, but I thought I'd get more out of my bit part in the Valerie Plame saga than the overheated scrutiny of a few bloggers.

Back when I was at *Time*, I co-wrote the July, 2003 story that has made the last two years of Matthew Cooper's life so difficult. After the special counsel went after Matt so enthusiastically, the arrival of men in trench coats asking what I knew seemed imminent. But I never got to try out any of my Dashiell Hammett lines on them. When my other former *Time* colleague Viveca Novak got tangled in Fitzgerald's hunt last year, I thought, OK, they're coming now for sure. Nope. No Fitzgerald; no FBI; no nothing.

But it turns out the special counsel was on to me all along. Last week, Scooter Libby filed a motion requesting materials from Patrick Fitzgerald's investigation. The filing included a Jan. 23, 2006, letter from Fitzgerald to Libby's legal team (marked Exhibit C) that contained this paragraph:

> We also advise you that we understand that reporter John Dickerson of *Time* magazine discussed the trip by Mr. Wilson with government officials at some time on July 11 or after, subsequent to Mr. Cooper learning about Mr. Wilson's wife. Any conversations involving Mr. Dickerson likely took place in Africa and occurred after July 11.

The Fitzgerald letter (first discovered by a very sharp blogger) was written in response to the Libby team's questions about other government officials who talked to reporters about Joe Wilson's wife. This line of inquiry from Libby doesn't have any obvious connection to his main defense that he was a very busy man. The Jan. 31 filling reads: "Mr. Libby will show that, in the constant rush of more pressing matters, any errors he made in his FBI interviews or grand jury testimony, months after the conversations, were the result of confusion, mistake, or faulty memory, rather than a willful intent to deceive."

But there is a connection. Team Libby may be trying to show that Plame's name and identity were in wider circulation than Fitzgerald has suggested. That's not in itself a defense against the perjury and obstruction charges. But if journalists were chattering about Plame a lot, perhaps his lawyers will back up the "he was a busy man" line with "this wasn't that big a deal to him." In other words, they may try to argue that the Plame-Wilson connection was already a well-known bit of gossip and wouldn't be important enough for someone as busy and important as Libby to specifically remember it. Other conversations between government officials and reporters might also help Libby make a case that Fitzgerald didn't do a broad investigation, but zeroed in on Libby early and bent the facts to fit a predetermined conclusion.

Though Fitzgerald threw out the tidbit about me (thanks, Pat), he turned down Libby's request to pick through his investigative material. Now it's up to the judge to decide whether Libby gets to take a look. While the wheels of justice grind, here's my story, for whatever it's worth:

In July 2003, I was a White House correspondent for *Time* magazine, traveling with the president in Africa. Bush was trying to promote his $15 billion AIDS assistance package but he kept getting interrupted. He would visit a clinic and give a speech, but all reporters wanted to ask about was faulty prewar intelligence. Joe Wilson had published his infamous op-ed in the *New York Times* just before the trip. That, along with other disclosures, led White House spokesman Ari Fleischer to make a rare public admission: The 16 words mentioning Saddam's efforts to buy uranium from Africa were "incorrect" and should not have been in the 2003 State of the Union address.

That didn't stop the questions. It multiplied them. At every stop, we reporters clamored for an explanation of how that

bad information about "yellowcake" had gotten into the speech. National Security Adviser Condoleezza Rice and Secretary of State Colin Powell, who were traveling with Bush, held press conferences, but they raised more questions than they answered. The papers seemed to have a damaging new disclosure about weak prewar intelligence every day. Administration officials assumed the leaks were coming from the CIA, where analysts didn't want to be blamed for the failure to uncover weapons stockpiles in Iraq.

The White House-CIA spat had been growing over the previous months. It was the second billing on the fight card below the Powell-Cheney cage match. When an administration official would say something that hinted the intelligence services might have made mistakes about Saddam's weapons, leaks would soon follow suggesting that White House officials had spun carefully nuanced information from the CIA into a case for war. "Remind me to take something more than a knife to a gun fight," one senior administration official on the trip said to me, referring to the spat.

Four days into the trip, on an early morning flight to Uganda, Condi Rice visited the small press cabin in the back of Air Force One, where I was in the pool of reporters that flies on the president's plane. We expected more of the same fancy footwork from earlier in the week about who was to blame for the 16 words. We didn't get it. Condi blamed the CIA. This was new. The Bush administration didn't usually point fingers that openly. (We later learned that Dr. Rice had called Tenet that morning to let him know she was going to ruin his day.)

Moments later, we landed in Entebbe, Uganda. We drove past the abandoned Air France jet still marooned at the airport more than 30 years after the famous 1976 Israeli raid. We thought that would be the biggest drama of our short four-hour visit. Though the travel pool was going to be allowed in to see the start of President Bush's meeting with Ugandan President Yoweri Museveni, we were told Bush wouldn't take a question, as he sometimes does in such situations. But moments before the meeting, we were told that Bush had changed his mind and would take a question. He knew that he would be asked about the faulty info and had a line prepared. "I gave a speech to the nation that was cleared by the intelligence services," Bush said.

This was news. The president was known for his loyalty to subordinates, but here he was throwing his CIA director, George Tenet, under a bus. This wasn't just a personal departure by the president. It was the ultimate blow in the bureaucratic battle between the CIA and his White House.

We pool reporters were hustled away from the dignitaries into a cramped holding room where they kept us until the larger press contingent arrived for the president's public remarks. They'd set up phone lines and I tried to dial out the news. Given the local technology, it took a while. When I finally made it through, I realized it was 8 a.m. in the States*. I left a rambling message on my bureau chief's voicemail, which he would pick up several hours later and relay in an e-mail to my colleagues working on the story: "John reports that they've dimed out Tenet."

*Click here for Part 2 to find out what government officials told me about Wilson's trip and why Patrick Fitzgerald's account of my conversations is wrong.*

*Correction, Feb. 8, 2006: The article originally and incorrectly stated that it was 5 a.m. in Washington when Bush finished his remarks. It was 8 a.m.*

*John Dickerson is Slate's chief political correspondent. He can be reached at slatepolitics@gmail.com.*

Article URL: http://www.slate.com/id/2135554/

Copyright 2006 Washingtonpost.Newsweek Interactive Co. LLC

politics

# Where's *My* Subpoena?

Valerie Plame, Scooter Libby, and me.
By John Dickerson
Updated Tuesday, Feb. 7, 2006, at 6:37 AM ET

*This is the second part of a two-part article. Click here for Part 1, explaining why John Dickerson's name has popped up in connection with the CIA leak case.*

While the president finished his meeting with Museveni, I hung out with a "senior administration official" by an old yellow school bus. This was the first of my two conversations about Wilson. In his letter to Libby, Fitzgerald has the chronology mixed up. When I had these conversations, I hadn't yet talked to my colleague Matt Cooper about Wilson, and Cooper hadn't yet talked to Rove.

The senior administration official spoke to me on background about Wilson and the president's amazing decision to blame the CIA. Other reporters wandered in and out of the conversation, but there were stretches where it was just the two of us (my tedious newsmagazine questions always had a tendency to drive other deadline-oriented reporters away). The official walked me through all the many problems with Wilson's report: His work was sloppy, contradictory, and hadn't been sanctioned by Tenet or any senior person. Some low-level person at the CIA was responsible for the mission. I was told I should go ask the CIA who sent Wilson.

An hour later, as Bush spoke at an AIDS treatment center, I chatted with a different senior administration official, also on background. We talked about many different aspects of the story—the fight with the CIA, the political implications for the president, and the administration's shoddy damage control. This official also pointed out a few times that Wilson had been sent by a low-level CIA employee and encouraged me to follow that angle. I thought I got the point: He'd been sent by someone around the rank of deputy assistant undersecretary or janitor.

At the end of the two conversations I wrote down in my notebook: "look who sent." It was about 10:30 a.m. in Washington as the event ended. I called the Washington bureau but couldn't reach anyone (they were all huddled in the morning meeting). What struck me was how hard both officials were working to knock down Wilson. Discrediting your opposition is a standard tactic in Washington, but the Bush team usually played the game differently. At that stage in the first term, Bush aides usually blew off their critics. Or, they continued to assert their set of facts in the hope of overcoming criticism by force of repetition.

We boarded Air Force One about 11 a.m. Washington time and flew to Nigeria. When I got into the press filing center there, I picked my way though dubious local food and checked my e-mail. White House officials had warned us the country was a hot zone of infestation. To avoid parasites we were not only told not to drink the water but not to shower, wash, or brush our teeth with it. We were also advised to bring our own sheets to sleep on. So, eating the locally provided dinner was probably a bad idea. I pushed aside the clumps of stew.

It had been a long week. I was co-writing a long story on the trip for the European edition, filing each day to the Web site and also filing for the domestic cover story on the fallout over the 16 words. Oh, and I also had to file a story on violence in Liberia. My inbox was a mess. In the middle of it was an e-mail from Matt Cooper telling me to call him from a land line when I had some privacy. At some time after 1 p.m. his time, I called him. He told me that he had talked to Karl Rove that morning and that Rove had given him the same Wilson takedown I'd been getting in Uganda. But Matt had the one key fact I didn't: Rove had said that Wilson's *wife* sent him.

So, that explained the wink-wink nudge-nudge I was getting about who sent Wilson. Matt and I agreed to point out in our files to the cover story that White House officials were going so directly after Wilson. We also agreed that I wouldn't go back to my sources about the wife business. The universe of people who knew this information was undoubtedly small. Mentioning it to other officials would potentially out Rove as *Time*'s source to his colleagues. Plus, it was Matt's scoop and his arrangement with Rove. He had a better sense of how to get the information confirmed

without violating their agreement.

That Friday night in Washington, CIA Director George Tenet fell on his sword, taking responsibility for not carefully vetting the State of the Union speech. That big news eclipsed the storyline about an effort by White House officials to discredit Wilson.

I missed the final sausage-making process of putting together the weekly magazine. As *Time*'s cover story was being written in Washington, I was flying back from Africa. I saw the final piece only moments before it was closed. By then, Matt had talked to Scooter Libby, who confirmed Rove's tip. The attack on Wilson had not been included. The writers focused on his original trip and the damage his op-ed had done to administration credibility. *Time*'s cover showed the president giving the State of the Union address under the headline "Untruth and Consequences."

Since the attack on Wilson was not included in the printed magazine that came out Monday, Cooper thought we should put it online. All administrations discredit their critics through whispers to reporters, but we hadn't seen high-level Bush people do anything like this in the past. It suggested desperation and unsteadiness in a national security team that had often been heralded for its smooth competency.

At this point the information about Valerie Plame was not the radioactive material it is today. No one knew she might have been a protected agent—and for whatever reason, the possibility didn't occur to us or anyone else at the time. But it was still newsworthy that the White House was using her to make its case. That Scooter Libby and Karl Rove mentioned Plame to Matt was an example of how they were attempting to undermine Wilson. They were trying to make his trip look like a special family side deal not officially sanctioned by the agency. No one at a high level in the government was worried enough about the veracity of the uranium claim to send a "real" special envoy. And no one at a high level ever saw Wilson's report when he returned. Later we would learn that Deputy National Security Adviser Stephen Hadley had been warned by the CIA that the uranium claims were shaky and that Wilson's wife was one of many people involved in the decision to send her husband.

Our editors delayed publication of the Web piece, uncertain there was enough evidence the White House was trying to undermine Wilson's credibility. That was frustrating, since by that time the White House spokesman, Fleischer, was undermining him on the record. Bob Novak's story revealing Plame's name had come out, but those of us working on the story in Washington, which now included Massimo Calabresi, thought we still had a few facts Novak didn't. Our piece finally ran on the Web on July 17, 2003, six days after Cooper had learned about Wilson's wife.

Where did Fitzgerald learn about my activities? Matt told me he briefly mentioned me in front of the grand jury and Viveca Novak said my name came up in passing when she talked to Fitzgerald. He also subpoenaed White House e-mail records that included, White House officials tell me, e-mails I sent to them about the Wilson business in the days and months after that July trip to Africa. Those officials also told Fitzgerald and his grand jury about conversations we had. I came back from the trip harboring a suspicion that only fully made sense when I learned Plame's CIA cover had been blown. It seemed obvious that the people pushing me to look into who sent Wilson knew exactly the answer I'd find. Yet they were really careful not to let the information slip, which suggested that they knew at the time Plame's identity was radioactive.

That's my bit of the story. I don't expect my grandchildren will be asking me to repeat it again in 30 years on the porch swing. *Oh, Grampa, tell us again about the two senior administration officials in Africa.* If they want something more exciting, they'll have to ask Uncle Matt.

*John Dickerson is* **Slate's** *chief political correspondent. He can be reached at* slatepolitics@gmail.com.

Article URL: http://www.slate.com/id/2135565/

Copyright 2006 Washingtonpost.Newsweek Interactive Co. LLC

# EXHIBIT K

**The New York Times**
nytimes.com

---

July 12, 2003

# Bush Has Praise for Uganda In Its Fight Against AIDS

**By RICHARD W. STEVENSON**

President Bush praised Uganda today as a model for how African nations can succeed in combating AIDS and pledged that the United States would help underwrite efforts to fight an epidemic that has cost millions of lives and disrupted efforts by many countries to lift themselves from poverty.

Speaking to an AIDS support group here on the fourth day of his Africa trip, Mr. Bush praised Uganda's president, Yoweri Museveni, for working to remove the stigma of AIDS and aggressively pursuing a program that includes drug treatments, as well as promoting abstinence, condom use and education about the disease.

Uganda is among the few developing nations to have reduced its AIDS infection rate. Mr. Bush put the rate at 5 percent, down from 30 percent a decade ago. Although there is some debate among experts about whether the decline has been that sharp, there is general agreement that it has been impressive. One of the main reasons, they say, is that Mr. Museveni, far more than other African leaders, has cast aside cultural taboos and political worries to tackle the problem head on.

"You have worldwide influence here because you've provided a model of care for Uganda," Mr. Bush told volunteers and H.I.V.-positive people he met here. "Life by life, village by village, Uganda is showing that AIDS can be defeated across Africa."

Having developed the will to combat the pandemic, Mr. Bush said, Africa now needs more money to do so. Referring to his proposal to spend $15 billion over five years to help some of the world's poorest nations to step up their efforts against the disease, Mr. Bush said the United States would help provide it.

"And this is my country's pledge to the people of Africa and the people of Uganda: You are not alone in this fight," the president said, with Mr. Museveni looking on. "America has decided to act."

In coming to Uganda, Mr. Bush was not only sending a message to other poor countries that it was both possible and necessary to strike a more aggressive stance in dealing with the disease. He was also trying to demonstrate to Congress that increased assistance from the United States would be money well spent, despite his own insistence that Congress hold spending down on most programs outside of the military.

Mr. Bush did not mention that the House took action on Thursday to finance his AIDS initiative next year at $2 billion, about what the administration had originally requested but $1 billion less than allowed under legislation Mr. Bush signed enthusiastically this spring.

Condoleezza Rice, the president's national security adviser, told reporters today on Air Force One that Mr. Bush "believes very strongly in full funding of this." She left unclear whether the White House considered its target for full financing next year to be $2 billion or $3 billion.

Mr. Bush's high-profile call to action on AIDS in Africa, an issue about which he had shown little interest before this

year, stems from a number of factors. Eager to repair the image of the United States around the world after the deep diplomatic rifts over the war in Iraq, he has stressed on this trip that he wants the United States to be known around the world not just for its military might but also for its compassion.

But his stance also reflects a growing feeling in one of his core constituencies, religious conservatives, that dealing with the suffering caused by AIDS in Africa is a moral imperative. In doing so, religious groups have forged an alliance with liberal activist groups that have long called on rich nations to do more to help.

"I believe God has called us into action," Mr. Bush said today. "We are a great nation; we're a wealthy nation. We have a responsibility to help a neighbor in need, a brother and sister in crisis."

In Mr. Museveni, Mr. Bush is dealing with a leader who has helped Uganda make tremendous economic progress after the ravages of Idi Amin's brutal dictatorship of the 1970's. Mr. Museveni is a favorite of the White House because he has been among the most helpful of East African leaders in pursuing terrorists on the continent and because he is a free-market conservative who says that trade rather than handouts is the key to his country's future.

A high standing with Washington has helped Mr. Museveni at home, where he is under increasing pressure to allow more political opposition and to give up what some of his critics said was an effort to remain in office after the end of his second five-year term in 2006. Under the country's Constitution, he is limited to two terms.

It was not clear whether Mr. Bush, in a half-hour private meeting with the Ugandan leader, pressed Mr. Museveni not to remain in office indefinitely or discussed with him plans for an increased American military presence here.

Mr. Bush's arrival in Uganda brought out the biggest crowds of his trip so far, with hundreds and perhaps thousands of people lining the road from the airport to the hotel where the leaders met. After meeting with AIDS patients, Mr. Bush heard a moving rendition of "America the Beautiful" by a choir of children who had lost one or both parents to AIDS or to war. They finished the song with broad smiles on their faces and their arms stretched toward heaven.

---

Copyright 2006 The New York Times Company | Home | Privacy Policy | Search | Corrections | XML | Help | Contact Us | Work for

# EXHIBIT L

**Libby Filing: A Denial and a Mystery**
By Jason Leopold
t r u t h o u t | Report

Friday 14 April 2006

*Libby's court filing of late Wednesday evening does little to refute the government's charges against him.*

Defense attorneys for I. Lewis "Scooter" Libby said in a court filing late Wednesday that the former chief of staff for Vice President Dick Cheney doesn't remember a conversation he had with a State Department official in June 2003 in which the official told Libby that Valerie Plame Wilson worked for the CIA.

But the conversation did take place, according to current and former administration officials and attorneys who have remained close to the two-year-old CIA leak probe. At least a half-dozen witnesses who testified before a grand jury over the past two years said that they were at the meeting when Marc Grossman, the former Under Secretary of State for Political Affairs, told Libby that Plame Wilson worked for the CIA, according to attorneys and US officials close to the two-year-old CIA leak probe. Grossman also told Libby that Plame Wilson got the CIA to send her husband, former Ambassador Joseph Wilson, on a fact-finding trip to Niger in February 2002 to check out reports that Iraq tried to purchase uranium from the African country. Wilson took the trip and reported back to the CIA in March that he found no evidence that Iraq tried to acquire uranium.

"It's not just Mr. Grossman's word against Mr. Libby's," said one former State Department official knowledgeable about the substance of the conversation between Grossman and Libby. "There were other people present at the meeting at the time when Mr. Grossman provided Mr. Libby with details about Ms. Plame's employment with the agency. There is an abundance of evidence Mr. Fitzgerald has that will prove this."

Plame Wilson was unmasked as a covert CIA operative in a July 14, 2003, column written by Robert Novak. Ambassador Wilson believes White House officials leaked his wife's name as retribution because he publicly accused the administration of "twisting" intelligence to win support for the war against Iraq.

Libby's defense attorneys said Libby did not intentionally lie about how he found out that Plame Wilson worked for the CIA. They said Libby was dealing with national security issues and other pressing matters and simply forgot about the details regarding how he found out about Plame Wilson's employment.

The meeting between Libby and Grossman is a crucial part of the government's case against Libby. It demonstrates that Libby knew about Plame Wilson a month or so before her name was published in a newspaper column and proves that Libby lied to the grand jury when he testified that he found out about Plame Wilson from reporters in July 2003.

The facts surrounding Libby's conversation with Grossman surfaced in the obstruction of justice and perjury indictment Special Prosecutor Patrick Fitzgerald secured against Libby last October.

In the indictment, Fitzgerald wrote that Grossman told Libby "on or about June 11 or 12, 2003, that, in sum and substance, Wilson's wife worked at the CIA and that State Department personnel were saying that Wilson's wife was involved in the planning of his trip."

But Libby's attorneys, for the first time Wednesday, said Libby doesn't "recall" speaking with Grossman about Plame Wilson.

"During his grand jury appearances, Mr. Libby testified that he did not recall any conversations with Mr. Grossman about Mr. Wilson's wife," says the court filing written by Libby's attorneys.

Grossman has turned out to be an important witness for the prosecution, people close to the probe said.

The former Under Secretary of State derided the campaign to discredit Wilson and was outraged that the White House retaliated against Wilson by leaking his wife's identity to reporters, people close to Grossman said.

Grossman has provided FBI investigators and Fitzgerald with detailed information about the behind-the-scenes effort by Libby and other White House officials to undercut Ambassador Wilson's credibility. Grossman testified before a grand jury that the leak of Plame Wilson's name and CIA status to reporters was an "act of revenge" against her husband's criticism of the administration's use of the uranium claims in President Bush's January 28, 2003, State of the Union address.

Grossman, now vice chairman at The Cohen Group, an international lobbying firm in Washington, DC, was traveling Thursday. His assistant said he could not be reached for comment.

Attorneys as well as current and former administration officials close to the case said Grossman was the lone dissenting unnamed official quoted in a September 28, 2003, Washington Post story who told two Post reporters that "two top White House officials" called "at least six

Washington journalists and disclosed the identity and occupation of Wilson's wife."

"Clearly, it was meant purely and simply for revenge," the Washington Post quoted the senior administration official, whom sources have identified as Grossman, as saying. According to sources, Grossman told the Post that the Plame Wilson leak was "wrong and a huge miscalculation, because they were irrelevant and did nothing to diminish Wilson's credibility."

Additionally, Grossman provided a dissenting opinion for a July 20, 2005, Associated Press story. Identified as a "retired state department official," Grossman told the AP that a classified State Department memo disputed the legitimacy of administration claims that Iraq sought to acquire uranium from Niger. The memo also contained a few lines about Plame Wilson's CIA employment, which were marked as secret.

The memo was written in June 2003 by Carl Ford, the former head of the Bureau of Intelligence and Research (INR), at the request of Grossman. The memo was prepared after a Washington Post story quoted an unnamed former US official who said the White House knowingly used bogus intelligence about Iraq's threat to purchase uranium from Niger. The US official who spoke to the Post on background has since been identified as former Ambassador Joseph Wilson.

Speaking to the AP on background, Grossman said the INR memo "wasn't a Wilson-Wilson wife memo. It was a memo on uranium in Niger and focused principally on our disagreement" with the White House.

"The former State Department official stressed the memo focused on Wilson's trip and the State Department intelligence bureau's disagreement with the White House's claim about Iraq trying to get nuclear material. He said the fact that the CIA officer and Wilson were husband and wife was largely an incidental reference," the July 20, 2005, AP story says, quoting Grossman, according to people close to the leak case.

In the interest of fairness, any person identified in this story who believes he has been portrayed unfairly or that the information in this story is untrue will have the opportunity to respond in this space.

# EXHIBIT M

**washingtonpost.com**

# Bush Administration Is Focus of Inquiry

CIA Agent's Identity Was Leaked to Media

By Mike Allen and Dana Priest
Washington Post Staff Writers
Sunday, September 28, 2003; Page A01

At CIA Director George J. Tenet's request, the Justice Department is looking into an allegation that administration officials leaked the name of an undercover CIA officer to a journalist, government sources said yesterday.

The operative's identity was published in July after her husband, former U.S. ambassador Joseph C. Wilson IV, publicly challenged President Bush's claim that Iraq had tried to buy "yellowcake" uranium ore from Africa for possible use in nuclear weapons. Bush later backed away from the claim.

The intentional disclosure of a covert operative's identity is a violation of federal law.

The officer's name was disclosed on July 14 in a syndicated column by Robert D. Novak, who said his sources were two senior administration officials.

Yesterday, a senior administration official said that before Novak's column ran, two top White House officials called at least six Washington journalists and disclosed the identity and occupation of Wilson's wife. Wilson had just revealed that the CIA had sent him to Niger last year to look into the uranium claim and that he had found no evidence to back up the charge. Wilson's account touched off a political fracas over Bush's use of intelligence as he made the case for attacking Iraq.

"Clearly, it was meant purely and simply for revenge," the senior official said of the alleged leak.

Sources familiar with the conversations said the leakers were seeking to undercut Wilson's credibility. They alleged that Wilson, who was not a CIA employee, was selected for the Niger mission partly because his wife had recommended him. Wilson said in an interview yesterday that a reporter had told him that the leaker said, "The real issue is Wilson and his wife."

A source said reporters quoted a leaker as describing Wilson's wife as "fair game."

The official would not name the leakers for the record and would not name the journalists. The official said there was no indication that Bush knew about the calls.

It is rare for one Bush administration official to turn on another. Asked about the motive for describing the leaks, the senior official said the leaks were "wrong and a huge miscalculation, because they were irrelevant and did nothing to diminish Wilson's credibility."

Wilson, while refusing to confirm his wife's occupation, has suggested publicly that he believes Bush's senior adviser, Karl C. Rove, broke her cover. Wilson said Aug. 21 at a public forum in suburban Seattle that it is of keen interest to him "to see whether or not we can get Karl Rove frog-marched out of the White House in handcuffs."

White House press secretary Scott McClellan said yesterday that he knows of no leaks about Wilson's wife. "That is not the way this White House operates, and no one would be authorized to do such a thing," McClellan said. "I don't have

Advertisement



TAKE ACTION NOW. Help stop Medicare drug restrictions.

Click Here to Learn More

Paid for by Sepracor

any information beyond an anonymous source in a media report to suggest there is anything to this. If someone has information of this nature, then he or she should report it to the Department of Justice."

McClellan, who Rove had speak for him, said of Wilson's comments: "It is a ridiculous suggestion, and it is simply not true." McClellan was asked about Wilson's charge at a White House briefing Sept. 16 and said the accusation is "totally ridiculous."

Administration officials said Tenet sent a memo to the Justice Department raising a series of questions about whether a leaker had broken federal law by disclosing the identity of an undercover officer. The CIA request was reported Friday night by MSNBC.com. Administration sources familiar with the matter said the Justice Department is determining whether a formal investigation is warranted.

An intelligence official said Tenet "doesn't like leaks."

The CIA request could reopen the rift between the White House and the intelligence community that emerged this summer when Bush and his senior aides blamed Tenet for the inclusion of the now-discredited uranium claim -- the so-called "16 words" -- in the State of the Union address in January.

Tenet issued a statement taking responsibility for the CIA's approval of the address before it was delivered, but made clear the CIA had earlier warned the White House not to use the allegations about uranium ore. After an ensuing rush of leaks over White House handling of intelligence, Bush's aides said they believed in retrospect it had been a political mistake to blame Tenet.

The Intelligence Protection Act, passed in 1982, imposes maximum penalties of 10 years in prison and $50,000 in fines for unauthorized disclosure by government employees with access to classified information.

Members of the administration, especially Vice President Cheney and Defense Secretary Donald H. Rumsfeld, have been harshly critical of unauthorized leakers, and White House spokesmen are often dismissive of questions about news reports based on unnamed sources. The FBI is investigating senators for possibly leaking intercept information about Osama bin Laden.

The only recipient of a leak about the identity of Wilson's wife who went public with it was Novak, the conservative columnist, who wrote in The Washington Post and other newspapers that Wilson's wife, Valerie Plame, "is an agency operative on weapons of mass destruction." He added, "Two senior administration officials told me that Wilson's wife suggested sending him to Niger."

When Novak told a CIA spokesman he was going to write a column about Wilson's wife, the spokesman urged him not to print her name "for security reasons," according to one CIA official. Intelligence officials said they believed Novak understood there were reasons other than Plame's personal security not to use her name, even though the CIA has declined to confirm whether she was undercover.

Novak said in an interview last night that the request came at the end of a conversation about Wilson's trip to Niger and his wife's role in it. "They said it's doubtful she'll ever again have a foreign assignment," he said. "They said if her name was printed, it might be difficult if she was traveling abroad, and they said they would prefer I didn't use her name. It was a very weak request. If it was put on a stronger basis, I would have considered it."

After the column ran, the CIA began a damage assessment of whether any foreign contacts Plame had made over the years could be in danger. The assessment continues, sources said.

The CIA occasionally asks news organizations to withhold the names of undercover agents, and news organizations usually comply. An intelligence official told The Post yesterday that no further harm would come from repeating

Plame's name.

Wilson was acting U.S. ambassador to Iraq during the run-up to the Persian Gulf War of 1991. He was in the diplomatic service from 1976 until 1998, and was the Clinton administration's senior director of African affairs on the National Security Council. He is now an international business consultant. Wilson said the mission to Niger was unpaid except for expenses.

Wilson said he believes an inquiry from Cheney's office launched his eight-day mission to Niger in February 2002 to check the uranium claim, which turned out to be based at least partly on forged documents. "The way it was briefed to me was that the office of the vice president had expressed an interest in a report covering uranium purchases by Iraq from Niger," Wilson said in a telephone interview yesterday.

He said that if Novak's account is accurate, the leak was part of "a deliberate attempt on the part of the White House to intimidate others and make them think twice about coming forward."

Sources said that some of the other journalists who received the leak did not use the information because they were uncomfortable with unmasking an undercover agent or because they did not consider the information relevant to Wilson's report about Niger.

Sen. Charles E. Schumer (D-N.Y.), who has been pushing the FBI to investigate the disclosure since July, said yesterday that it "not only put an agent's life in danger, but many of that agent's sources and contacts."

*Staff writer Richard Leiby contributed to this report.*

© 2003 The Washington Post Company

# EXHIBIT N



NEWS   OPINION   ACTION

# The CIA leak

By Robert Novak

Oct 1, 2003

WASHINGTON -- I had thought I never again would write about retired diplomat Joseph Wilson's CIA-employee wife, but feel constrained to do so now that repercussions of my July 14 column have reached the front pages of major newspapers and led off network news broadcasts. My role and the role of the Bush White House have been distorted and need explanation.

The leak now under Justice Department investigation is described by former Ambassador Wilson and critics of President Bush's Iraq policy as a reprehensible effort to silence them. To protect my own integrity and credibility, I would like to stress three points. First, I did not receive a planned leak. Second, the CIA never warned me that the disclosure of Wilson's wife working at the agency would endanger her or anybody else. Third, it was not much of a secret.

The current Justice investigation stems from a routine, mandated probe of all CIA leaks, but follows weeks of agitation. Wilson, after telling me in July that he would say nothing about his wife, has made investigation of the leak his life's work -- aided by the relentless Sen. Charles Schumer of New York. These efforts cannot be separated from the massive political assault on President Bush.

This story began July 6 when Wilson went public and identified himself as the retired diplomat who had reported negatively to the CIA in 2002 on alleged Iraq efforts to buy uranium yellowcake from Niger. I was curious why a high-ranking official in President Bill Clinton's National Security Council (NSC) was given this assignment. Wilson had become a vocal opponent of President Bush's policies in Iraq after contributing to Al Gore in the last election cycle and John Kerry in this one.

During a long conversation with a senior administration official, I asked why Wilson was assigned the mission to Niger. He said Wilson had been sent by the CIA's counterproliferation section at the suggestion of one of its employees, his wife. It was an offhand revelation from this official, who is no partisan gunslinger. When I called another official for confirmation, he said: "Oh, you know about it." The published report that somebody in the White House failed to plant this story with six reporters and finally found me as a willing pawn is simply untrue.

At the CIA, the official designated to talk to me denied that Wilson's wife had inspired his selection but said she was delegated to request his help. He asked me not to use her name, saying she probably never again will be given a foreign assignment but that exposure of her name might cause "difficulties" if she travels abroad. He never suggested to me that Wilson's wife or anybody else would be endangered. If he had, I would not have used her name. I used it in the sixth paragraph of my column because it looked like the missing explanation of an otherwise incredible choice by the CIA for its mission.

How big a secret was it? It was well known around Washington that Wilson's wife worked for the CIA. Republican activist Clifford May wrote Monday, in National Review Online, that he had been told of her identity by a non-government source before my column appeared and that it was common knowledge. Her name, Valerie Plame, was

no secret either, appearing in Wilson's "Who's Who in America" entry.

A big question is her duties at Langley. I regret that I referred to her in my column as an "operative," a word I have lavished on hack politicians for more than 40 years. While the CIA refuses to publicly define her status, the official contact says she is "covered" -- working under the guise of another agency. However, an unofficial source at the Agency says she has been an analyst, not in covert operations.

The Justice Department investigation was not requested by CIA Director George Tenet. Any leak of classified information is routinely passed by the Agency to Justice, averaging one a week. This investigative request was made in July shortly after the column was published. Reported only last weekend, the request ignited anti-Bush furor.

*Robert Novak is a television personality and columnist. Novak is also editor of the Evans-Novak Political Report available through a free offer from Human Events Online.*

*Copyright © 2003 Townhall.com*

Find this story at: http://www.townhall.com/opinion/columns/robertnovak/2003/10/01/168398.html