IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | 1:06-mc-00128-RBW |
| v. | ) | |
| | ) | (CR. No. 05-394 (RBW)) |
| I. LEWIS LIBBY, | ) | |
|     also known as "Scooter Libby" | ) | Oral argument requested |
| | ) | |
| TIME INC., | | |
|     Movant. | | |

**REPLY BRIEF OF TIME INC. IN SUPPORT OF ITS
MOTION TO QUASH OR MODIFY**

Time Inc. ("Time") respectfully submits this reply brief in support of its motion to quash or modify the subpoena issued to it by Defendant I. Lewis "Scooter" Libby.

**INTRODUCTION**

Mr. Libby's brief in opposition ("Opp.") confirms his intent to conduct a fishing expedition through Time's files for documents that may or may not exist, and that would have no relevance to the issues in this case in any event. This tactic is prohibited by Federal Rule of Criminal Procedure 17, which provides that subpoenas duces tecum may *not* be used as a way to conduct discovery. Moreover, Rule 17's requirements of relevance, admissibility and specificity must be strictly applied where, as here, significant First Amendment interests are threatened—an argument made in Time's motion to quash, and one that Mr. Libby's brief largely ignores. Even if Mr. Libby's subpoena satisfied the requirements of Rule 17—which it plainly does not—it demands documents protected by the reporter's privilege under the First Amendment and common law, and must be quashed or modified for that reason as well.

## ARGUMENT

I.  **THE SUBPOENA MUST BE QUASHED OR MODIFIED BECAUSE IT IS A DISCOVERY SUBPOENA THAT SEEKS DOCUMENTS THAT ARE NOT RELEVANT.**

   A.  **Mr. Libby Misstates The Governing Legal Standard.**

Mr. Libby's brief sets forth a sweeping, expansive, and fundamentally incorrect interpretation of Federal Rule of Criminal Procedure 17(a). Under his view, "it is sufficient for a defendant to explain what he reasonably believes to be contained in the documents sought, and why that material may be relevant to his defense." Opp. at 5 (quotation and punctuation omitted).

Not so. Rule 17(a) requires parties to identify *with specificity* the precise documents they seek, demonstrate that they would be admissible, and establish relevance. It does not entitle a party to engage in discovery—*i.e.*, to demand the production of broad categories of documents in hopes of finding a single document that might have relevance, or that might lead to the discovery of relevant documents. *See United States v. Nixon*, 418 U.S. 683, 698-99 (1974) ("the subpoena *duces tecum* in criminal cases . . . was not intended to provide a means of discovery"); *United States v. Brooks*, 966 F.2d 1500, 1505 (D.C. Cir. 1992) (affirming the quashing of subpoena duces tecum where the defendant "was improperly trying to use the subpoena as a discovery tool"); *United States v. Haldeman*, 559 F.2d 31, 75 (D.C. Cir. 1976) (Rule 17(c) "is not a discovery device"). *Cf*. Fed. R. Civ. P. 26(b).

The very cases Mr. Libby cites to support his position actually undercut it. Those cases demonstrate that, to satisfy Rule 17's standards of relevance, admissibility and specificity, a subpoena must be narrowly drawn:

- In *United States v. LaRouche Campaign*, 841 F.2d 1176, 1177 (1st Cir. 1988), the court deemed the defendant's subpoena sufficiently specific under Rule 17 when

it was limited to "'outtakes' (videotaped material not broadcast) of an interview with a prospective key witness."

- In *United States v. Poindexter*, 725 F. Supp. 13, 28-29, 30 (D.D.C. 1989), the court rejected "the use of trial subpoenas *duces tecum* as a supplemental discovery device," and required the defendant to "submit[ ] to the Court subpoenas *duces tecum* for **specific, relevant documents**" (emphasis added).

- In *United States v. Haldeman*, 559 F.2d 31, 75 (D.C. Cir. 1976), the court *affirmed* the quashing of the defendant's trial subpoena, emphasizing that Rule 17(c) "is not a discovery device" and "confines a subpoena *duces tecum* to admissible evidence."

- In *United States v. King*, 194 F.R.D. 569, 575 (E.D. Va. 2000), the defendant subpoenaed "the unedited recordings, and the interview notes" of a television reporter's interview of a specific witness, as well as—more generally—"any other recordings of statements by or conversations with other known or potential witnesses to this case." Although the district court enforced the subpoena as to the specified materials concerning the one identified witness, it modified the subpoena by not requiring compliance with the generalized request for "any other" materials concerning *other* witnesses.

Mr. Libby mischaracterizes the court's holding in *United States v. Noriega*, 764 F. Supp. 1480 (S.D. Fla. 1991). Purporting to quote from that decision, Mr. Libby's brief states: "under the law, it is sufficient for a defendant to explain what he 'reasonably . . . believe[s] to be contained in the documents sought,' and why that material may be relevant to his defense." Opp. at 5 (ellipsis and brackets in original). The passage from *Noriega* reads, in full, "[i]f the moving

3

party cannot reasonably *specify the information contained* or believed to be contained in the documents sought but merely hopes that something useful will turn up, this is a sure sign that the subpoena is being misused." 764 F. Supp. at 1493 (emphasis added). The emphasized language is omitted from Mr. Libby's brief and replaced with an ellipsis. Thus, while Mr. Libby cites *Noriega* to support his position that courts "have rejected a benchmark" of specificity and particularity, Opp. at 5, his brief actually deletes the word "specify" from the court's opinion.

As shown below, it is clear that Mr. Libby is casting an overbroad net in "hopes that something useful will turn up," *Noriega*, 764 F. Supp. at 1493, and his subpoena should therefore be quashed or modified.

### B. The Subpoena Seeks Irrelevant Documents And Infringes On First Amendment Interests.

Mr. Libby has issued a discovery subpoena, in that he is seeking to learn about communications that *may* have occurred and documents that *may* exist. He hopes to drag a wide net over all documents in Time's possession and see what might turn up. Rule 17(c) does not allow this.

The documents Mr. Libby demands from Time are far afield from the issues relating to Time raised by the Indictment: whether Mr. Libby testified falsely about his conversation with Matthew Cooper on July 12, 2003. Based on Time's reasonable searches for responsive documents to date, and aside from documents it has already produced to the Special Counsel, Time does not have any (1) documents concerning Mrs. Wilson's CIA status; (2) documents concerning conversations by Time employees with any government official about the Wilsons; or (3) contemporaneous documents reflecting Mr. Cooper's conversation with Mr. Libby prepared at or around the time that conversation occurred. The only documents Time has that

4

are even arguably responsive are materials reflecting conversations between a reporter and Mr. Wilson, and drafts and internal correspondence concerning the TIME stories "A Question of Trust" (July 21, 2003), "What I Told the Grand Jury" (July 25, 2005) and "What Scooter Libby and I Talked About" (November 7, 2005).[1]

In fact, Mr. Libby *already possesses* the documents concerning the actual issues raised by the Indictment. He has obtained all of the documents that were produced by Time in response to the Special Counsel's broad request for

> Any and all documents (including, but not limited to, notes, memos, emails and draft articles) reflecting conversations between Matthew Cooper and official source(s) prior to July 14, 2003, concerning in any way: former Ambassador Joseph Wilson; the 2002 trip by former Ambassador Wilson to Niger; Valerie Wilson Plame a/k/a Valerie Wilson a/k/a Valerie Plame (the wife of former Ambassador Wilson); and/or any affiliation between Valerie Wilson Plame and the CIA.

*See* Opp. at 34 n.10 (admitting that "[t]he Special Counsel has provided the defense with documents previously subpoenaed from Time and Mr. Cooper," but insisting that the Special Counsel's subpoena was of "limited scope").[2] Mr. Libby also possesses the most direct evidence of Mr. Cooper's recollection of their conversation: the transcript of Mr. Cooper's testimony before the grand jury. Mr. Libby's demand for *additional* documents is procedurally improper: he has issued what are plainly discovery requests for information that he speculates

---

[1] With regard to Request No. 5, Time will produce the unredacted version of the document Bates-stamped MC 0043-44, which has previously been produced to the Special Counsel.

[2] Mr. Libby is mistaken in suggesting, Opp. at 34, that Matthew Cooper maintained a special "Scooter Libby file" that has not already been produced. The documents to which Mr. Libby appears to be referring have already been produced to the Special Counsel, and turned over to Mr. Libby.

might exist, relating to issues that he thinks might arise, based on defenses that he might raise if he can find evidence to support them. Rule 17 does not permit this approach.

Mr. Libby asserts that "Time does not deny that documents prepared or received by Mr. Cooper are relevant." Opp. at 32. But this misstates Time's position. Time's motion to quash expressly stated that "the subpoena demands documents that have little to no relevance to the allegations and issues in this case," and cited, as a particularly egregious *example*, documents created or received by persons other than Matthew Cooper. Motion at 4. The fact that Time emphasized the irrelevance of documents that do not involve Matthew Cooper obviously does not amount to an admission that all documents involving Mr. Cooper are relevant.[3]

Although Mr. Cooper is the only Time employee identified as a potential witness, Mr. Libby asserts that he is entitled to know what other reporters and editors at Time knew about the Wilsons on the theory that "evidence that Ms. Wilson's CIA affiliation was known outside the intelligence community is critical to the defense." Opp. at 7. But as Time pointed out in its motion, this theory has no stopping point. Rule 17(c) does not authorize Mr. Libby to conduct a search through the files of reporters and the news media on the ground that he is entitled to any information concerning the Wilsons possessed by persons "outside the intelligence community." Similarly, although Mr. Libby cites a *Newsweek* article as authority for his claim that "what Mr. Cooper had learned about Ms. Wilson was clearly a topic of conversation in Time's Washington bureau," Opp. at 33, this hearsay article, published in April 2006, concerns

---

[3] Mr. Libby's suggestion that footnote 3 of this Court's March 10, 2006 order forecloses any relevance challenge to documents involving Mr. Cooper is misplaced. This Court's order did not involve the instant subpoena duces tecum, which is governed by the strict relevance standards of Rule 17(c), and it is unlikely that even Mr. Libby would take the position that *any* document in Time's possession that involves Mr. Cooper is *per se* relevant to this case.

Mr. Cooper's conversations with Karl Rove, not Mr. Libby, and in any event describes events that post-dated Mr. Cooper's conversation with Mr. Libby by many months.

Mr. Libby's demand for documents reflecting what other reporters knew about the Wilsons is apparently intended to support his defense that many reporters in Washington knew about Mrs. Wilson's CIA affiliation and were discussing it. According to the Indictment, Mr. Libby told the FBI that "[d]uring a conversation with Matthew Cooper of Time magazine on July 12, 2003, [he] told Cooper that reporters were telling the administration that Wilson's wife worked for the CIA." *See* Indictment, Count 3, ¶ 2. But Mr. Libby has never alleged, and apparently does not claim, that any reporter at Time (other than Mr. Cooper) ever discussed the Wilsons with him. Mr. Libby's generalized assertion that the Wilsons were a topic of discussion among Washington reporters is not a sufficiently specific basis for a Rule 17 subpoena to Time. Indeed, Mr. Libby's approach would circumvent Rule 17's careful limits on the scope of subpoenas duces tecum, and would effectively nullify *Nixon*'s requirements of relevance, specificity and admissibility.

Mr. Libby repeatedly asserts that the documents he seeks "may assist in showing the evolution of [Mr. Cooper's] pro-Wilson bias." *See, e.g.*, Opp. at 34, 35. But the suggestion that Mr. Cooper was prompted by a "pro-Wilson bias" to give inaccurate testimony to the grand jury about his conversation with Mr. Libby is speculative and absurd. Mr. Cooper fought to protect Mr. Libby's identity as his source, refusing to testify and going into contempt of court. He was prepared to go to jail to protect Mr. Libby's confidentiality and only agreed to testify once Mr. Libby explicitly granted him permission to do so. The notion that Mr. Cooper had a "pro-Wilson" bias—and, by implication, an "anti-Libby" bias—that caused him to give inaccurate testimony is utterly unsupported and contrary to the facts and common sense. This farfetched

conspiracy theory cannot justify Mr. Libby's subpoena seeking draft articles written two years after the events in question.

Finally, Mr. Libby largely ignores the fact that the documents he is demanding—including drafts of articles, unpublished notes of reporters, and other documents created during the newsgathering and editorial process—are entitled to heightened protection under Rule 17(c) because they implicate strong First Amendment interests. Mr. Libby takes the position that the only relevant interest is his interest in discovering documents and preparing his defense. But courts have made clear that the First Amendment interests of the party being subpoenaed must be considered. *See In re Grand Jury Subpoena: Subpoena Duces Tecum*, 829 F.2d 1291, 1300 (4th Cir. 1987) ("the concerns that underlie [the First Amendment] must enter into the balancing of interests that is required by a motion to quash under Fed. R. Crim. P. 17(c)"); *see also United States v. R. Enterprises, Inc.*, 498 U.S. 292, 303 (1991) (directing court of appeals to consider whether First Amendment interests require heightened scrutiny of grand jury subpoena under Rule 17(c)).

### C. The Subpoena Cannot Be Enforced On The Ground It Seeks "Impeachment Evidence."

Mr. Libby contends that "it is perfectly permissible for a court to grant access to potential impeachment evidence before a trial begins." Opp. at 4. But Mr. Libby does not explain why this case warrants a departure from what he concedes is the "general[]" rule. *See Nixon*, 418 U.S. at 701 ("Generally, the need for evidence to impeach witnesses is ***insufficient*** to require its production in advance of trial.") (emphasis added); *United States v. Cuthbertson*, 630 F.2d 139, 144 (3d Cir. 1980) ("impeachment statements, although subject to subpoena under Rule 17(c), generally are not subject to production and inspection [by the defendant] prior to trial"). Although Mr. Libby asserts that production prior to trial would help him "properly prepare" his

8

case, Opp. at 4, the same could be said in virtually *any* case. Mr. Libby fails to identify what testimony he anticipates could be impeached, or explain how the evidence he seeks could be used to impeach it.

Mr. Libby cites to *Fryer v. United States*, 207 F.2d 134 (D.C. Cir. 1953), as warranting the pretrial production of potential impeachment material. Opp. at 8. *Fryer* was a murder case in which the district court quashed the defendant's subpoena seeking his own statements and statements of witnesses, and the D.C. Circuit reversed. The year after *Fryer* was decided, however, a District of Columbia district court expressly held that "the ruling in the *Fryer* case must be deemed limited to capital cases." That case, *United States v. Carter*, 15 F.R.D. 367, 372 (D.D.C. 1954), was the *sole* authority cited by the Supreme Court in *Nixon* to support its statement that "[g]enerally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." 418 U.S. at 701 (citing *Carter*, 15 F.R.D. at 371). *Nixon* thus confirms that Mr. Libby's reliance on *Fryer* is misplaced.

Mr. Libby also cites *LaRouche*, 841 F.2d 1176, to support his argument. But in that case, the First Circuit explained that it was willing to depart from the general rule only because of "the unique circumstances of [the] case"—namely, that the witness whom the defendants hoped to impeach through outtakes from a televised interview had recently testified at the trial of a co-defendant and would "likely give testimony against the defendants that is substantially similar." *Id*. at 1180 n.7. In such circumstances, the court held, the witness's "general testimony [was] already known" and thus the concern over admissibility was diminished. *Id*. at 1180. The First Circuit's decision—which the court went out of its way to limit to its "unique circumstances"—does not support the broad reading Mr. Libby gives it, and certainly does not suggest that a departure from the general rule would be justified in *this* case.

9

## II. THE SUBPOENA MUST BE QUASHED OR MODIFIED BECAUSE IT SEEKS DOCUMENTS PROTECTED BY THE REPORTER'S PRIVILEGE.

Even if Mr. Libby's subpoena satisfied the standards of Rule 17—which it plainly does not—it would need to be quashed or modified because the documents it requests are protected by the reporter's privilege that exists under the First Amendment and common law.

### A. First Amendment

Mr. Libby contends that there is no First Amendment-based reporter's privilege applicable in criminal cases. Opp. at 37-41. Mr. Libby rests his argument on the Supreme Court's 1972 decision in *Branzburg v. Hayes*, 408 U.S. 665 (1972), and the D.C. Circuit's splintered panel decision in *In re Grand Jury Subpoena to Judith Miller*, 438 F.3d 1141 (D.C. Cir. 2006), *modifying* 397 F.3d 964 (D.C. Cir. 2005). Neither case, however, supports Mr. Libby's position.

In *Branzburg*, the Supreme Court declined to hold that a reporter's privilege relieved journalists from an obligation to testify in a grand jury investigation being conducted in good faith. Mr. Libby misreads *Branzburg*, however, in arguing that its holding "applies to criminal proceedings across the board." Opp. at 38. To be sure, the court in *United States v. Liddy*, 354 F. Supp. 208 (D.D.C. 1972), appeared to accept this view, but the *Liddy* court's narrow interpretation of *Branzburg* was superseded by the D.C. Circuit's subsequent ruling in *Zerilli v. Smith*, 656 F.2d 705 (D.C. Cir. 1981). Indeed, in *Zerilli*, the D.C. Circuit explained that *Branzburg* allows a First Amendment privilege "even where a reporter is called before a grand jury to testify." *Id.* at 711. Accordingly, the suggestion in *Liddy* that *Branzburg* forecloses a First Amendment privilege in all criminal matters does not remain good law.

With regard to the *Judith Miller* decision, that case arose in the context of a grand jury subpoena, and thus is distinguishable for the same reason that *Branzburg* is. *See* 397 F.3d at 970 ("Unquestionably, the Supreme Court decided in *Branzburg* that there is no First Amendment privilege protecting journalists from appearing before a grand jury or from testifying before a grand jury or otherwise providing evidence to a grand jury . . . ."). Nothing in either *Branzburg* or *Judith Miller* precludes application of a First Amendment privilege outside the limited context of a grand jury subpoena.

Mr. Libby's attempt to distinguish *United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000), is equally unavailing. Mr. Libby does not dispute that in *Ahn*, the D.C. Circuit held that "reporters possess a qualified privilege" grounded in the First Amendment. *Id.* at 37. Rather, Mr. Libby contends that *Ahn* is distinguishable because it arose in the context of an attempted withdrawal of a guilty plea. Opp. 40. Not only does this argument contradict his earlier argument that *Branzburg* "applies to criminal proceedings across the board," Opp. 38, but Mr. Libby does not explain why a criminal defense subpoena issued in the context of withdrawing a guilty plea should be treated any differently from a criminal defense subpoena issued in the context of preparing for trial.

Finally, Mr. Libby's repeated invocations of the "constitutional dimensions" of "the right of a criminal defendant to the production of evidence," Opp. at 39, again turns a blind eye to the considerable First Amendment interests at stake here. Mr. Libby is entitled to make the argument that his asserted constitutional rights as a criminal defendant outweigh the First Amendment interests at issue in this case, but he misstates the law in assuming that his "right to evidence" is the *only* interest at issue.

**B.     Common Law**

Time's motion to quash showed why the Supreme Court's decision in *Jaffee v. Redmond*, 518 U.S. 1 (1996), virtually compels recognition of a common law reporter's privilege. Mr. Libby does not dispute that the Court must resolve this question through application of *Jaffee*'s three-part test; rather, Mr. Libby contends that application of those factors bars recognition of a privilege under the common law and Federal Rule of Evidence 501. In so arguing, Mr. Libby fails even to mention, let alone rebut, Judge Tatel's conclusion that *Jaffee* requires recognition of a common law privilege. *See In re Grand Jury Subpoena to Judith Miller*, 397 F.3d at 991-1001 (Tatel, J., concurring).

First, Mr. Libby observes that "a number of states and the District of Columbia" have enacted reporter's shield statutes. Opp. at 42. In fact, 31 States and the District have done so—and 18 more have recognized protection through judicial decision. Mr. Libby notes that "the statutes vary widely," *id*., but the *Jaffee* Court explicitly recognized that "variations in the scope of the protection" cannot "undermine the force" of the States' judgment that some form of privilege is warranted. 518 U.S. at 14 n.13. And while Mr. Libby contends that these statutes generally are not interpreted "to deprive a criminal defendant of specific evidence relevant to prove his innocence at trial," Opp. at 42, that point is not only inaccurate but irrelevant, in that it goes to whether a privilege may be *overcome* in a particular case, not whether a privilege should be *recognized*.

The second *Jaffee* factor requires courts to assess whether the privilege serves significant public and private interests. Mr. Libby concedes that "a free press is an important public good," but argues that *Branzburg* found that reporters would not be "unduly hampered" by the absence of a privilege. But *Branzburg* was decided nearly 35 years ago—prior to Watergate, prior to the

enactment of Rule 501, and prior to the Court's decision in *Jaffee*, which set forth a new framework for recognizing privileges under the common law that does not require empirical proof of the harm to First Amendment interests. *See* 518 U.S. at 10 (recognizing psychotherapist-patient privilege based on the prospect that "the ***mere possibility*** of disclosure may" harm significant public and private interests) (emphasis added); *cf. id*. at 24 (Scalia, J., dissenting) (criticizing majority for not requiring enough evidence on this point).

Third, with regard to the question whether the First Amendment interests outweigh the likely evidentiary benefits that would result from denial of the privilege, all Mr. Libby can say is that the harm is "speculative" and "clearly outweighed" by a defendant's "right to obtain evidence that may establish his innocence." Mr. Libby thus fails entirely to respond to the argument in Time's motion to quash: that any evidentiary benefit that would result from the denial of the privilege is modest, given that "[w]ithout a privilege, much of the desirable evidence to which litigants . . . seek access . . . is unlikely to come into being." *Jaffee*, 518 U.S. at 12.

For these reasons, this Court should recognize and apply a common law reporter's privilege in this case. Regardless of the precise formulation of the privilege this Court may recognize, it clearly would encompass the irrelevant documents demanded by Mr. Libby's subpoena.

**PRAYER FOR RELIEF**

This Court should quash or modify the subpoena and award Time Inc. all other relief to which it may be justly entitled.

Dated: May 8, 2006

Respectfully submitted,

                        /s/

| | |
|---|---|
| Robin Bierstedt | Theodore J. Boutrous, Jr. |
| Andrew Lachow | D.C. Bar No. 420440 |
| Time Inc. | Thomas H. Dupree, Jr. |
| 1271 Avenue of the Americas | D.C. Bar No. 467195 |
| Room 38-45 | GIBSON, DUNN & CRUTCHER LLP |
| New York, NY 10020 | 1050 Connecticut Avenue N.W. |
| (212) 522-3217 | Washington, DC 20036 |
| | Telephone: (202) 955-8500 |
| | Fax: (202) 530-9689 |

*Attorneys for Time Inc.*